Filed 3/20/13  P. v. Simon CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID SIMON,<br><br>    Defendant and Appellant. | A133701<br><br>(Solano County<br> Super. Ct. No. VCR203509) |

This is an appeal from the conviction by jury of defendant David Simon of five felony offenses related to his sexual abuse of a minor.  We affirm.

**FACTUAL AND PROCEDUREAL BACKGROUND**

On June 17, 2010, a consolidated and amended information was filed alleging defendant engaged in:  (1) oral copulation and sexual penetration with D.G., a minor ten years of age or younger, on or about and between May 10 and May 15, 2009 (Pen. Code, § 288.7, subd. (b)[1]) (count one); (2) sexual intercourse and sodomy with D.G., a minor ten years of age or younger, on or about and between May 10 and May 15, 2009 (§ 288.7, subd. (a)) (count two); (3) sexual intercourse and sodomy with D.G., a minor ten years of age or younger, on or about and between January 1, 2007 and December 31, 2008 (§ 288.7, subd. (a)) (count three); (4) sexual intercourse and sodomy with D.G., a minor ten years of age or younger, on or about and between January 1, 2007 and December 31, 2008 (§ 288.7, subd. (a)) (count four); (5) oral copulation and sexual penetration with

---

[1]     All further statutory citations herein are to the Penal Code.

D.G., a minor ten years of age or younger, on or about and between January 1, 2007 and December 31, 2008 (§ 288.7, subd. (b)) (count five); (6) continuous sexual abuse of D.G., a child under age 14, while defendant resided with and had recurring access to the child on or about and between January 1, 2007 and May 15, 2009 (§288.5, subd. (a)) (count 6); and (7) possession or control of child pornography on or about and between October 16, 2008 and July 2, 2009 (§ 311.11, subd. (a)) (count 7). The continuous sexual abuse charge in count six was thereafter dismissed, and the child pornography charge in count seven was renumbered as count six.

## I.    The Jury Trial.

Trial by jury began on August 2, 2011, at which the victim, D.G., born in May 2000, testified. Also testifying were D.G.'s mother, S.T., another minor, J.C., who lived with defendant during the relevant time, and several expert and police witnesses. The following facts were revealed in their testimony.

### A.  Crimes on or about January 1, 2007 to December 31, 2008 (counts 3-5).

D.G., her mother and siblings lived with defendant at his home in Vallejo for a few years from the time she was about seven years old. D.G. enjoyed living there because defendant was nice to her and she had many friends in the area.[2] D.G. did not like, however, when defendant touched her, something that began occurring soon after her family moved into his house. Defendant touched her so many times D.G. was unable to recall particular instances, although it occurred often when she was between seven and nine years old. D.G. told no one about the touching because she feared defendant would harm her or her family, although defendant never said he would do so.[3]

---

[2]    D.G.'s mother, S.T., had known defendant since she was eight years old, and considered him her uncle even though they were not actually related. Her children also considered defendant like an uncle. S.T. and her children lived with defendant in Vallejo from May 2006 until sometime in 2008, during which time he often cared for the children while she was at work.

[3]    D.G. did not recall telling police defendant threatened to kill her family if she told.

2

When asked what part of her body defendant touched, D.G. responded: "My private and my butt." She then added "my mouth." The first and only time defendant put his "private" in D.G.'s mouth he told her to "suck it like a lollypop." She was scared, but did what he said and, eventually "white stuff" came out of his private. Afterward, defendant told D.G. to brush her teeth, which she did.

D.G. did not recall how many times defendant put his private in her private, but it was more than once and probably more than five times. Sometimes when this occurred, defendant took off D.G.'s clothes, which she did not like. When defendant put his private in her private, it hurt. Defendant would usually moan and, more than once, white stuff came out. She knew what defendant was doing was wrong, but she did not tell him to stop.

Defendant also put his private part of the way into her butt and moved it around. This occurred more than twice. Before defendant did this, he made D.G. shower. Sometimes, D.G. felt like defendant was humping her, which she knew meant moving around on top of her.

D.G. could not recall the last time defendant had touched her, but she believed it "probably" was when she was nine years old.[4] D.G. identified a photograph dated February 9, 2009, that included an image of her schoolwork at defendant's house. D.G. recalled being at defendant's house and doing her homework on that date, and also recalled being at his house after that date. No one besides defendant had ever touched her inappropriately.

On June 10, 2009, D.G. underwent an MDIC interview after admitting to her mother, S.T., that defendant had touched her many times in the past. A video of this interview was played for the jury. After beginning the interview by telling the interviewer the difference between the truth and a lie, D.G. stated that she was being sent there because "Somebody touched me." When asked who touched her, D.G. responded

---

[4]    D.G. later testified that she did not recall whether defendant put his private in her private or her butt when she was seven, and that he did not put his private in her mouth when she was seven.

3

defendant touched her when she was seven. When asked how many times, she responded: "I can't count them."

D.G. also told the interviewer that, when she was eight and defendant was babysitting her and her brother, defendant put his private in her mouth, butt and private. During this occasion, she and defendant were in an upstairs room, and defendant told her to get on the floor and remove her pajama bottoms, which she did. At this point, defendant began humping her, penetrating her, and forcing her to orally copulate him. Defendant then told D.G. to brush her teeth and go to the living room before her brother awoke.

D.G. recalled one other instance, when she was eight, when defendant put his private in her butt. However, defendant put his private in her private "a lot of times" when she was eight, usually at his house. Defendant had also done this to D.G. "[a] lot of times" when she was seven, but these events occurred at his "old house," which she described as an apartment. D.G. then volunteered that defendant "made me get on top of him and he started – he started going—like holding on my waist and start going up and down." When this occurred, defendant was clothed and did not actually put his private in her private.

D.G. also shared that defendant once took her to McDonalds for breakfast and told her, " 'I'm not going to do that again.' But he – he did it again, he lied." When asked whether defendant ever asked her not to tell anyone about the touching, D.G responded: "He said, If I um, don't do that, he'll kill my family."

**B. Crimes on or about May 10, 2009 to May 15, 2009 (counts 1-2).**

When D.G. was asked by the interviewer when defendant last touched her, D.G. said it was in May of 2009, the 10th or 11th, just before her birthday, at defendant's Vallejo house before they left for a weekend trip to Reno. D.G. explained that she spent the night at defendant's house with her younger sister, a 13-year-old girl named J.C., and

4

her nine-year-old cousin.[5] That night, while watching a movie in defendant's bedroom on the bed, defendant told both D.G. and her cousin to take off their clothes. D.G. took off her pajama bottoms, not her shirt, and defendant "started doing nasty stuff," first to D.G.'s cousin, then to her. D.G. saw defendant put his private in her cousin's mouth and "hump" her. He then approached D.G, humping her, putting his private part of the way in her private and then in her mouth. D.G. demonstrated how far defendant penetrated her. D.G. also stated that white stuff came out of his private and a little bit got on her tongue. Defendant then told her to go brush her teeth and then to put her clothes back on, which she did. The next day, they traveled to Reno, where nothing else happened.

Later, at trial, D.G. confirmed that, in May 2009, around her May 14th birthday, defendant took D.G., her younger sister, and J.C. to Reno for the weekend to attend a birthday party for his stepdaughter. Defendant picked up D.G. from a relative's house, and took her to his house in Vallejo, where they spent the night before leaving the next day for Reno. D.G., her younger sister and J.C. were all present at defendant's house. Before this weekend, defendant had touched D.G. many times, but she still wanted to go with him to Reno, but was unsure why.[6] D.G. did not recall whether defendant touched her during their weekend trip, either before or after they arrived in Reno. D.G. did recall, however, telling a police representative when she was probably nine that something had happened at defendant's Vallejo house the night before they left for Reno, although later she told defense counsel she did not recall telling police this information. Nor did she recall telling police defendant had also put his private in her nine-year-old cousin's

---

[5]    D.G. referred to J.C. as defendant's daughter, but J.C. testified she was not related to defendant, although she did live with him in Vallejo in 2009, during at least part of which time D.G. and her sister also lived there. J.C. did not notice anything unusual about D.G.'s behavior during or after their weekend trip to Reno, or anything else unusual about the weekend.

[6]    D.G. told police in 2009 that she asked defendant to take her to Reno because it was her birthday. At trial, however, D.G. testified she did not tell police she requested the trip, and in fact the trip was not her choice. She also testified that her cousin was not at appellant's house that weekend. J.C. likewise testified D.G.'s cousin was not present.

5

mouth and private, as her cousin was not there that weekend and she had never seen defendant inappropriately touch her cousin.

When D.G. returned from Reno, her mother, S.T., noticed she "had an attitude" and asked her if something had happened. S.T. later became suspicious that D.G. was being sexually molested after finding a dark brown stain in the underwear D.G. had taken on the trip. D.G.'s mother had been sexually molested as a child, and recognized D.G.'s attitude changes might stem from being molested.[7] According to D.G., this was the first time anyone had asked D.G. this question. At first, D.G. lied and said no. However, she eventually told her mother the truth, that defendant had touched her, because she wanted her mother to stop crying.[8] Among other things, D.G. told her mother that defendant had touched her a lot of times, including when she and her sister spent the night with him in Vallejo before leaving for their Reno trip. Specifically, D.G. told S.T. that defendant had humped her butt with his pants up, then fondled her. D.G. cried when telling her this, but then seemed relieved. S.T. also cried, because defendant was like an uncle to them.[9]

The next day, S.T. took D.G. to the emergency room for an examination. S.T. also called defendant, cursing at him and asking: "Why you did this to my daughter?" S.T. also recalled speaking to police, but she was unsure when this first occurred.

D.G. recalled later talking to several police officers about the weekend of the Reno trip. Talking to the officers was "not really" fun for her. She also did not like being in the same room with defendant because she did not "want to see his face."

---

[7]     D.G. said S.T. found the stained underwear before her Reno trip.

[8]     S.T. testified she had asked D.G. numerous times in the past if someone had touched her private parts, including after finding other stained underwear. D.G. had always answered "no." However, this time, S.T. kept probing D.G. because her negative response was more hesitant.

[9]     S.T. also testified defendant had offered $20,000 and to buy her a house if she would not report the abuse to police, but she declined. S.T. was unsure, however, whether she ever told police about this attempted bribery. Defense counsel questioned S.T. regarding whether she had D.G. falsely accuse defendant to avoid repaying a $300 loan she had taken from him, a suggestion S.T. vehemently denied. In a pretext phone call from S.T. to defendant, he said he did not care about the $300.

6

## C. Expert and Police Witness Testimony.

Sexual assault nurse examiner Lisa Javar, who had over 12 years of specialized sexual assault training, examined D.G. on June 9, 2009, when she was nine years old. Among other things, Javar performed a genital exam. Javar found no evidence of physical trauma or injury. However, Javar was not surprised by this lack of evidence given D.G.'s age, race and history. Where, as here, the victim is nine years old and three weeks have passed since the last alleged penetration, it is not unusual for examiners to find no injury.[10] A normal examination does not mean a sexual assault did not occur. More often than not, and from Javar's experience about 90 percent of the time, an examination is normal. Javar thus concluded D.G.'s examination neither confirmed nor negated anal or vaginal penetration.

Sexual assault nurse examiner Judy Malmgren, accepted as a forensic nursing expert by the court, reviewed medical photographs and records for D.G. Based on this review, Malmgren found no signs of past sexual abuse, even though she would have expected to find signs given the allegations that D.G. had been sexually penetrated for two years beginning at age seven.

Vallejo Police Department Evidence Technician, Stephanie Boursaw, testified regarding items collected by police from defendant's house on July 2, 2009. One such item seized from under a mattress in the master bedroom was pink clothing that Boursaw described as "some sort of like camisole or some piece of lingerie, except I believe it's a child's size."

Vallejo Police Detective Mathew Mustard first spoke with S.T. on June 10, 2009. S.T. told him she found a brownish stain in D.G.'s underwear on May 18, 2009, and that D.G. had denied being touched inappropriately until May 26, at which time D.G. told her defendant touched her during a weekend trip to Reno. S.T. did not tell Detective Mustard

---

[10] From birth to age five to seven, sexual penetration is likely to cause abrasion or tearing of the hymen. However, the hymen would heal quite quickly. By age eight to ten, the hymen becomes thicker and less delicate due to the effects of estrogen, even where the female has not yet started menstruating. The genitals of non-Caucasian girls tend to mature sooner than those of Caucasian girls.

7

that defendant offered to pay her $20,000 not to report the incident. Detective Mustard subsequently spoke with J.C. about the Reno trip with defendant. J.C. told Detective Mustard that D.G. was crying when they dropped her off in Antioch after the trip. J.C. denied defendant had ever touched her inappropriately, but did report that once, when she and her cousin were 14 years-old and staying at defendant's house, he asked them to stay in his room They declined, went to their own room and locked the door. Detective Mustard arrested defendant at his place of employment on July 1, 2009.

Vallejo Police Officer Drew Ramsey interviewed D.G. on May 27, 2009. D.G. told him she had spent the night at defendant's house about one week earlier, and that defendant crawled into bed with her and her cousin. Defendant told D.G. not to tell anyone, and then put his penis in her mouth until some white stuff came out. Defendant then told D.G. to go brush her teeth, which she did. He also told her he would kill or harm her family if she told anyone what had happened.

## II.    The Jury Verdict and Sentencing.

On August 10, 2011, the jury found defendant guilty of two counts of oral copulation and sexual penetration of a minor (§ 288.7, subd. (b)), and three counts of sexual intercourse and sodomy with a minor (§ 288.7, subd. (a)). The jury found defendant not guilty of one count of possessing child pornography (§ 311.11, subd. (a)). The trial court sentenced defendant to a total prison term of 105 years to life, leading to this appeal.

### DISCUSSION

Defendant raises three arguments on appeal. First, defendant contends the trial court prejudicially erred by instructing the jury it could find him guilty on count one, oral copulation and sexual penetration of D.G., and count two, sexual intercourse and sodomy with D.G., for acts he committed outside the time frame alleged in those counts (i.e., on or about and between May 10, 2009 and May 15, 2009). Second, defendant contends the trial court prejudicially erred when instructing the jury based on CALCRIM No. 318 "to find a prior inconsistent statement to be true," because it improperly shifted the burden of

8

proof to him. Finally, defendant contends his conviction on all counts lacks the support of substantial evidence, requiring reversal. We address each argument in turn.

## I. Instructing the Jury on Counts One and Two (§ 288.7, subds. (a), (b)).

Defendant contends the trial court prejudicially erred by failing to adequately instruct the jury with respect to the acts for which he could be convicted for orally copulating and sexually penetrating D.G. (count one), and for engaging in sexual intercourse and sodomy with D.G. (count 2), on or about and between May 10, 2009 and May 15, 2009. Specifically, defendant contends because "the People specifically elected to prosecute [him] in counts 1 and 2 based on acts alleged to have occurred in Vallejo, on the night before [he] took D.G. to Reno, it was improper to instruct the jury it could convict [him] on counts 1 and 2 based on acts outside that time frame." We conclude defendant forfeited his claim of instructional error by failing to raise it below and, even if he had not, it would fail on the merits.

Counts one and two charged defendant with committing on D.G., a child under 10, certain sexual acts on or about and between May 10, 2009 and May 15, 2009, and counts three through five charged him with committing on her similar sexual acts on or about and between January 1, 2007 and December 31, 2008. Consistent with these charges, the jury was instructed pursuant to CALCRIM No. 207, that it is "alleged that the crimes occurred on or about: [¶] Between May 10, 2009 and May 15, 2009: Counts 1 and 2[.] [¶] Between January 1, 2007 and December 31, 2008: Counts 3, 4, and 5[.] . . . [¶] . . . [¶] The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day." In addition, in connection with counts three through five only, the jury was instructed pursuant to CALCRIM No. 3501 that, to convict defendant of these charges, it had to agree the People proved defendant committed one of each of the alleged sexual acts within the designated time period of

9

January 1, 2007 to December 31, 2008, or that he committed all of the alleged sexual acts within that time period.[11]

According to defendant, the trial court's instruction on CALCRIM No. 207 was improper because it permitted the jury to convict him on counts one and two even if it found the charged offenses did not take place exactly during the time period of May 10 to May 15, 2009. This error was compounded, defendant continues, by the trial court's CALCRIM No. 3501 instruction "because CALCRIM No. 3501 limited the jury's requirement for unanimity to counts 3, 4 and 5, [and thus] the jury reasonably could have inferred (as the "negative pregnant") that unanimity was *not* required for a guilty verdict on counts 1 and 2. And because CALCRIM No. 207 allowed the jury to convict [him] on counts 1 and 2 for conduct that occurred outside the elected time frame of May 10 to May 15, 2009, the jury might have convicted [him] on those counts on the basis of uncharged conduct." To prevent this, defendant adds, the trial court should have, sua sponte, given the unanimity instruction set forth in CALCRIM No. 3502, rather than CALCRIM No. 207 and its corollary No. 3501. (See *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534-1536 [the court has a sua sponte duty to instruct the jury that the prosecutor has elected a specific factual basis for the charged offense if the prosecutor fails to inform the jury of the election].)

---

[11] CALCRIM No. 3501, as requested by the prosecution and given by the trial court, was as follows:

"The defendant is charged with engaging in sexual intercourse or sodomy with a child 10 years of age or younger and engaging in oral copulation with a child 10 years of age or younger in Counts 3, 4, and 5 sometime during the period of January 1, 2007 to December 31, 2008.

"The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless:

"1.   You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; [¶] OR

"2.   You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period . . . and have proved that the defendant committed at least the number of offenses charged."

10

As stated above, defendant did not object below to the trial court's instruction pursuant CALCRIM No. 207 and No. 3501, did not request clarification or a modification as to those instructions, and did not request an instruction pursuant to CALCRIM No. 3502.[12] Rather, defendant's attorney declared his approval of the instructions just before the trial court read them to the jury. As such, we conclude defendant's challenge based on the giving of or failure to give those instructions has been forfeited. (E.g., *People v. Lee* (2011) 51 Cal.4th 620, 637; *People v. Kelly* (1992) 1 Cal.4th 495, 535 [" 'The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel' "].)

In any event, turning to the merits, the relevant standard of review is not in dispute. "In reviewing [a] purportedly erroneous instruction[], 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citation.] In conducting this inquiry, we are mindful that ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 957.) " 'Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

Applying these rules here, we first point out the instructions given by the court did not, by their terms, permit the jury to convict defendant on counts one and two on the basis of uncharged conduct or conduct occurring outside the elected May 10 to May 15,

_____

12       Defendant requested a general unanimity instruction pursuant to CALCRIM No. 3500, but at no point objected to the prosecution's request for, or the trial court's subsequent reading of, the more specific unanimity instruction pursuant to CALCRIM No. 3501. On appeal, defendant contends for the first time that the court should have given the following modified version of CALCRIM No. 3502: "You must not find the defendant guilty of oral copulation or sexual penetration in Count 1 or sexual intercourse or sodomy in Count 2, unless you all agree that the People have proved specifically that the defendant committed that offense between May 10 and May 15, 2009. Evidence that the defendant may have committed the alleged offense on another day is not sufficient for you to find him guilty of the offense charged."

2009 time period). Rather, the instructions expressly *restricted* the jury's consideration of evidence related to the charges against defendant in counts one and two to a specific time period – to wit, acts of sexual misconduct occurring "on or about and between May 10, 2009 and May 15, 2009." This language, in turn, was consistent with both the law and the facts. Defendant does not dispute the People's case against him with respect to counts one and two was, as reflected in both the pleadings and in arguments to the jury, based on evidence of a single transaction between defendant and D.G. at his Vallejo house on the night around the time of her May 14, 2009 birthday before they left on a trip to Reno. As this record reflects, this is not a case where the prosecutor elected to base a molestation charge on a specific factual basis, but failed to so inform the jury. Rather, the jury was made well aware of the prosecutor's election with respect to counts one and two. (Cf. *People v. Melhado, supra,* 60 Cal.App.4th at pp. 1534-1536.)

In reaching this conclusion, we further note that California law generally does not require a prosecution to prove, or the jury to agree, that a sexual offense was committed against a minor on a specific day. Rather, the prosecution may, as here, rely on evidence the offense occurred within a more general time period (e.g., from May 10 to May 15, 2009). (*People v. Jones* (1990) 51 Cal.3d 294, 316 [while "the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period," specific details of where or when the acts occurred "are not essential to sustain a conviction"]. See also § 955 ["[t]he precise time at which the offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing thereof, except where the time is a material ingredient in the offense"].) While defendant correctly notes this rule permitting the prosecution to prove guilt beyond a reasonable doubt without reference to an exact date does not apply where the defense is one of alibi, here, the defense is that the victim, D.G., lacked credibility, not that defendant was absent for or unable to commit the alleged crimes on the day in question. As such, proof of an exact date was not required. (Cf. *People v. Barney* (1983) 143

12

Cal.App.3d 490, 497 ["if the defense is alibi or, as here, lack of opportunity to commit the offense, the exact time of commission becomes critically relevant to the maintenance of the defense," however, "[o]rdinarily, the People need not plead the exact time of commission of an alleged offense"]; *People v. Jennings* (1991) 53 Cal.3d 334, 358-359 ["when the prosecution's proof establishes the offense occurred on a particular day to the exclusion of other dates, and when the defense is alibi (or lack of opportunity), it is improper to give the jury an instruction using the 'on or about' language"].)[13]

Defendant's argument also disregards that the trial court gave other instructions to address possible confusion about the timing or nature of counts one and two, on the one hand, and counts three through five on the other hand. Most significant for purposes of this analysis, the trial court instructed the jury pursuant to CALCRIM No. 3515, that "[e]ach of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." We assume the jury properly followed this instruction, as well as the others. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 ["the presumption that jurors understand and follow instructions" is "[t]he crucial assumption underlying our constitutional system of trial by jury"].)

Finally, we consider defendant's suggestion the court erred by giving a unanimity instruction with respect to counts three through five (CALCRIM No. 3501), but not with respect to counts one and two. We again find no error. Because, based on both the presentation of evidence and arguments of counsel, the jury was informed that counts one and two related to a single transaction between defendant and D.G. on the night before their Reno trip, there was no reasonable probability the jury could have been confused, or failed to agree, as to which particular acts served as the basis of counts one and two. As

---

[13]    Defendant insists that "[s]ignificant discrepancies in the evidence created substantial doubt that the acts described by D.G. could have occurred at [his house] in that given time frame [of May 10 to May 15, 2009]." However, his claim relates to the sufficiency of the evidence supporting his conviction on counts one and two, rather than to the propriety of the court's instruction as to those counts. As such, we defer any analysis of it until Section III of the Discussion, where we address defendant's evidentiary challenge to all five counts on which he was convicted. (Pp. __.)

the California Supreme Court has explained, where "generic testimony describes a repeated series of *specific*, though indistinguishable, acts of molestation," a unanimity instruction "assists in focusing the jury's attention on each such act related by the victim and charged by the People." (*People v. Matute* (2002) 103 Cal.App.4th 1437, 1448.) Where, however, the testimony describes only a single incident from which the jury could conclude the defendant was guilty of the charged offense, a unanimity instruction is neither helpful nor required. (Cf. *People v. Jones, supra,* 51 Cal.3d at p. 321.) [14]

Thus, under a totality of these circumstances, we conclude the jury was adequately apprised of the applicable time period for each count against defendant. In particular, CALCRIM No. 207 properly restricted the time period during which defendant could be convicted of the charged offenses in counts one and two to the period "on or about and between May 10, 2009 and May 15, 2009" or some time "reasonably close" to those days. No reasonable juror could have believed evidence of any sexual act outside that time period or, specifically, outside the period encompassing the weekend of defendant's overnight trip with D.G. to Reno around the time of her May 14, 2009 birthday, could be relied upon to support his conviction on those counts. And, because there was no instructional error with respect to the trial court's giving of CALCRIM No. 207, there was no compounded error with respect to the giving of CALCRIM No. 3501 or failure to give CALCRIM No. 3502.

## II. Instructing the Jury on Inconsistent Witness Testimony (CALCRIM No. 318).

The trial court instructed the jury regarding evaluating inconsistencies in a witness's trial testimony and pretrial statements pursuant to CALCRIM No. 318, which provided as follows:

"You have heard evidence of statements that a witness made before trial. If you decide that the witness made those statements, you may use those statements in two ways:

---

[14]    Thus, counts three through five, contrary to counts one and two, did warrant a unanimity instruction because they related to multiple acts of sexual abuse against D.G. over a broader period of time when she lived or stayed with defendant, providing him regular access to her.

"1.    To evaluate whether the witness's testimony in court is believable; AND

"2.    As evidence that the information in those earlier statements is true."

Defendant contends this instruction was erroneous and resulted in prejudice because it was "tantamount to a mandatory presumption" that the jury should not believe trial testimony inconsistent with earlier-made pretrial statements. In so arguing, defendant relies on inconsistencies in D.G.'s trial testimony and her pretrial statements during the MDIC interview in June 2009. Specifically, during the MDIC interview, she claimed defendant first engaged in sexual acts with her nine-year-old cousin before engaging in substantially the same acts with her. At trial, however, D.G. testified her cousin was not present on the night in question, and that she did not see defendant sexually abuse her.[15] According to defendant, the court's instruction pursuant to CALCRIM No. 318 "created an unlawful presumption that D.G.'s subsequent denials were false," and thereby shifted the burden of proof to him in violation of his constitutional rights. We disagree.

CALCRIM No. 318, by its terms, permitted jurors to use a witness's pretrial statements in "two ways." First, jurors "may" use the statements to "evaluate whether the witness's testimony in court is believable." Second, jurors "may" use the witness's pretrial statements "[a]s evidence that the information in those earlier statements is true." Had this instruction created, as defendant claims, a *mandatory* presumption that the witness's trial testimony was false, the instruction would have used mandatory language. It did not. Rather, as set forth above, it used the permissive term, "may," a term neither ambiguous, unusual, nor purporting to create any presumption, whether for or against the veracity of a witness statement. As such, we decline to presume the jury, composed of men and women of reasonable intelligence, was incapable of understanding or following it. (*People v. Hudson* (2009) 175 Cal.App.4th 1025, 1028-1029 [because CALCRIM No. 318 states the jury "may" reject testimony if inconsistent with a pretrial statement, there is no basis for defendant's claim the instruction lessens the prosecution's standard of

_____

[15]    J.C. likewise testified D.G.'s nine-year-old cousin was not present on the night in question.

proof by compelling the jury to accept a pretrial statement as true]. See also *People v. Richardson, supra,* 43 Cal.4th at pp. 1027-1028.)

Defendant's argument also disregards the trial court's other instructions, including CALCRIM No. 226, which, among other things, advised the jury they could believe all, none, or part of a witness's testimony; and that, in evaluating witness testimony, they could consider anything reasonably tending to prove or disprove the testimony, including whether the witness made a prior inconsistent statement. And further diminishing any risk of jury confusion, the trial court gave CALCRIM No. 220, which, among other things, advised the jury of defendant's presumption of innocence, of the prosecution's duty to prove every element of each charged offense beyond a reasonable doubt, and of each juror's duty to impartially consider all evidence before reaching a verdict.

Thus, considered in the proper context of the jury charge as a whole, we conclude there is no reasonable likelihood the jury misapplied the court's instruction pursuant to CALCRIM No. 318. (*People v. Frye, supra,* 18 Cal.4th at p. 957.) Contrary to defendant's suggestion, this instruction was quite clear in its command that the jury could, but was not required to, use a witness's pretrial statements as evidence that the information in those statements is true.

## III.    The Sufficiency of the Evidence for Counts One through Five.

We are left with defendant's challenge to the sufficiency of the evidence supporting the jury's guilty verdict as to all counts. The guiding principles are well known. When a defendant challenges the sufficiency of the evidence, the reviewing court must examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which the jury could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-77.) Substantial evidence – meaning, evidence that is reasonable, credible and of solid value – must support each essential element of an offense. A judgment of conviction will not be set aside for insufficiency of the evidence to support the jury's verdict unless it is clearly shown there is no basis on which the evidence can support the jury's conclusion. (*Ibid.*)

16

In determining whether substantial evidence exists, we do not reweigh the evidence, resolve conflicts in the evidence or reevaluate the credibility of witnesses. (*People v. Jones, supra,* 51 Cal.3d at p. 314.) "Although it is the duty of the [trier of fact] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [trier of fact], not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

We also keep in mind that child molestation cases "frequently involve difficult, even paradoxical, proof problems." (*People v. Jones, supra*, 51 Cal.3d at p. 305.) Child victims of "resident child molester[s]," like defendant may have "no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents." (*Ibid.*) Recognizing this, the California Supreme Court has designed an evidentiary standard to more appropriately balance defendants' right to fair notice of the charges and to a reasonable opportunity to defend against those charges with the State's need to ensure that resident child molesters are not immunized from substantial criminal liability merely because their victims are unable to recall precise details concerning the repeated incidents of abuse. (*People v. Jones, supra*, 51 Cal.3d at pp. 305, 315-316.) Specifically, a child victim's generic testimony may be sufficient to support a conviction for sexual abuse so long as the testimony describes: (1) "*the kind of act or acts* committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g. lewd contact, intercourse, oral copulation or sodomy)"; (2) "the *number of acts committed* with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'); and (3) "the *general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure

17

the acts were committed within the applicable limitation period." (*People v. Jones, supra*, 51 Cal.3d at p. 316.) "Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Ibid.*; see also *People v. Matute, supra,* 103 Cal.App.4th at pp. 1444-1445.)

Here, of course, defendant is charged with committing specific acts of sexual abuse on or about and between May 10 to May 15, 2009, at his house in Vallejo the night before taking D.G. and others on an overnight trip to Reno (counts one and two). He is also charged, more generally, with committing repeated acts of sexual abuse throughout the broader period during which D.G. resided with him from approximately January 1, 2007 to December 31, 2008 (counts three through five). With respect to the former counts, the prosecutor relied on specific testimony and pretrial statements from D.G. and other witnesses regarding the events surrounding defendant's and D.G.'s trip to Reno around the time of her May 14, 2009 birthday. With respect to the latter counts, the prosecutor relied on D.G.'s more generic testimony and statements regarding the extended period during which she lived with and was cared for by defendant. The prosecution's evidentiary showing, we conclude, met the above-described standard set forth in *People v. Jones, supra,* 51 Cal.3d 294.

Specifically, we conclude D.G.'s pretrial statements regarding what occurred at defendant's Vallejo house the night before their Reno trip, considered with the testimony of her mother, S.T., regarding what D.G. later told her occurred, was sufficient to prove under counts one and two that defendant engaged in sexual intercourse, sodomy, sexual penetration and oral copulation on D.G. on or about and between May 10 to May 15, 2009. For example, D.G. stated during her June 10, 2009 MDIC interview that she was watching a movie in defendant's room the night before the Reno trip and around the time of her 9th birthday when he told her to undress, began to hump her, and then put his private part of the way into her private and then into her mouth. D.G. demonstrated to the interviewer how far defendant penetrated her, and told her that "white stuff" came out of his private and got on her tongue. D.G. also stated that defendant told her to go brush

18

her teeth and to get dressed, which she did. The next day, they traveled to Reno, where nothing else happened.

Consistent with D.G.'s pretrial statements, D.G.'s mother, S.T., described a brown stain she found in D.G.'s underwear when D.G. returned from Reno. S.T. testified this stain, as well as D.G.'s negative attitude, prompted her to ask D.G. whether anyone had molested her. After some probing, D.G. admitted to S.T. that defendant molested her the night before their Reno trip, as well as many times during the period their family lived with defendant at his house. S.T. reacted to D.G.'s admissions by taking D.G. to the hospital for a medical examination and, later, to the police to report the abuse.

D.G.'s pretrial statements and her and S.T.'s trial testimony were also sufficient to prove under counts three, four and five that defendant committed numerous sexual acts on her on or about and between January 1, 2007 and December 31, 2008, while she and her family were living at his house. For example, D.G. testified that defendant: (1) once put his private in her mouth, telling her to "suck it like a lollypop," which she did until "white stuff" came out and, after which, he told her to go brush her teeth; (2) more than once, and probably more than five times, put his private in her private, sometimes after undressing her (which she did not like), usually while moaning, and sometimes until white stuff came out ; and (3) more than twice, told her to shower and then put his private part of the way into her butt and moved it around.

D.G. also testified these acts occurred during the designated period – to wit, on or about and between January 1, 2007 and December 31, 2008. Specifically, she testified defendant committed sexual acts on her often when she was seven to nine years old, during the time period she and her family lived with him at his house and he babysat for her. In addition, S.T. confirmed that their family lived at his Vallejo house for two or three years between 2006 and 2008, during which time defendant often cared for D.G. and her siblings while she was at work. And, as mentioned above, S.T. confirmed that D.G. told her shortly after the Reno trip that defendant had touched her many times in the past, aside from the night before the Reno trip. This evidence, we conclude, was not only sufficient to prove defendant committed the acts charged in counts three through five on

19

or about and between January 1, 2007 and December 31, 2008, it was also sufficient to ensure he was *not* convicted under counts three through five for any act occurring during the period charged in counts one and two, to wit, on or about and between May 10, 2009 to May 15, 2009. (See *People v. Jones, supra,* 51 Cal.3d at p. 316.)

In reaching these conclusions, we acknowledge D.G.'s recollection of events and of details was at times vague and inconsistent. For example, during trial, D.G. denied or did not recall certain incidents of abuse by defendant that she described in detail during the June 2009 MDIC interview. In particular, D.G. testified that she did not recall whether defendant touched her during their weekend trip, either before or after leaving for Reno. She also testified that her nine-year-old cousin was not present the night before or during their weekend trip, even though she stated before trial that defendant also sexually abused her cousin the night before the trip. In addition, while D.G. initially recalled telling police that, when she was about nine, something happened at defendant's Vallejo house the night before the trip, later she denied to defense counsel having any memory of telling this to police. Finally, D.G. could not recall the exact dates and number of times defendant abused her when she lived at his house, whether the abuse occurred when she was seven, or whether defendant threatened to harm her or her family if she told anyone. However, despite these inconsistencies, D.G.'s testimony was not on the whole incredible. It was the jury's function, not ours, to resolve inconsistencies and contradictions in her testimony. (See *People v. Jones, supra,* 51 Cal.3d at p. 322 [noting the victim's credibility is usually the "true issue" in child molestation cases].) Rather, on appeal, our function is limited to resolving inferences and inconsistencies in favor of the judgment. (*People v. Cortes* (1999) 71 Cal.App.4th 62, 73-74.)

Accordingly, viewing the evidence, as we must, in the light most favorable to the judgment, we affirm defendant's conviction on all five counts. Based on the evidence presented, the jury had a reasonable basis upon which to conclude beyond a reasonable doubt that defendant committed the offenses of sexual penetration, oral copulation, sexual intercourse and sodomy on D.G. on or about and between May 10 and May 15,

2009, around the time of her ninth birthday, and also on or about and between January 1, 2007 and December 31, 2008, during the time period she resided in his home.

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.